FILED
U.S. DISTRICT COURT
AUGUSTA DIV.
2011 MAR 18 A 8:30
CLERK C Adamo
SO. DIST. CF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 111-001 |
| | ) | |
| AUSTIN BERNARD ELMORE | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the above-captioned criminal case, the government has accused Defendant Austin Bernard Elmore ("Elmore") of being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). (Doc. no. 1.) The matter is presently before the Court because Elmore has filed a motion to suppress all "all physical evidence or information seized from [Elmore's] person on October 28, 2010, as well as any statements [made by Elmore as a result of the October 28th encounter]." (Doc. nos. 14, 22.[1]) The government opposes this motion. (Doc. no. 25.) Elmore has submitted a copy of the incident report regarding the October 28th encounter in support of his motion (doc. no. 22, Ex. A), and on March 7, 2011, an evidentiary hearing was held, during which the Court heard testimony from Deputy Gabriel Garner of the Richmond County Sheriff's Office. For the reasons set forth below,

---

[1] Elmore filed a preliminary motion to suppress, and, upon prompting from the Court, he filed a particularized motion pursuant to Loc. Crim. R. 12.1. (See doc. nos. 14, 21, 22.) Although the Court's recommendation to deny the request for suppression applies to Elmore's preliminary and particularized motions, for ease of reference, the Court will refer to these two motions as a single motion to suppress.

the Court **REPORTS** and **RECOMMENDS** that the motion be **DENIED**.

I.  **FACTS**

On October 28, 2010, Deputies Garner and Banks with the Richmond County Sheriff's Office were on patrol in the National Hills neighborhood in Augusta, Georgia. (FTR 2:07:01 - 08:00.[2]) The deputies had been assigned to patrol that neighborhood because there had recently been an elevated number of burglaries in the area. (Id.) At about 3:45 p.m., the deputies, who were in separate patrol cars, saw Elmore and two other individuals walking down the street. (FTR 2:18:19 - 09:30.) Deputy Garner stopped his car in front of Elmore and the other individuals, and Deputy Banks parked his car behind Deputy Garner's car. (FTR 2:09:41 - 09:49.) The deputies asked Elmore and the other two individuals if they lived in the neighborhood. (FTR 2:09:50 - 10:00.) Elmore told the deputies that he and the other individuals did not live in the neighborhood, but were there because Elmore was looking at a nearby house that he was interested in purchasing. (FTR 2:10:02 - 10:08.) Deputy Garner explained that he and Deputy Banks were patrolling the neighborhood because of the recent burglaries and asked the individuals if they had identification; one of Elmore's companions produced identification, and the other began to provide his identifying information verbally. (FTR 2:10:09 - 11:12.)

At this point, Elmore began pacing back and forth and offering explanations about being in the neighborhood to look at a house; in addition, without being asked to do so, he offered to call someone on his cell phone to verify his story. (FTR 2:11:13 - 11:26.) After

---

[2]Although a transcript of the March 7, 2011 hearing has not been prepared, the Court was able to review the proceedings on the Court's recording system, For the Record ("FTR").

Deputy Garner took down the other individual's information, he asked Elmore for his name. (FTR 2:11:27 - 11:34.) Elmore replied that his name was "Andre Williams." (FTR 2:11:35.) Deputy Garner then asked Elmore to spell his first name, to which Elmore replied "Robert Davidson." (FTR 2:11:36 - 11:43.) Defendant Garner again asked Elmore to spell his first name, and Elmore again replied that his name was "Robert Davidson."[3] (FTR 2:11:45 - 11:50.) Deputy Garner testified that, based on his experience in law enforcement, Elmore's provision of two different names caused him to conclude that Elmore was attempting to conceal his identity and led to a suspicion that Elmore was hiding something.[4] (FTR 2:14:53 - 15:50.) Moreover, Deputy Garner indicated that because Elmore had provided two different names, he believed Elmore had committed the crime of providing a false name to a law enforcement officer. (FTR 2:18:43 - 19:00.)

Deputy Garner then asked all three individuals if they had any guns, weapons, or drugs. (FTR 2:12:03 - 12:11.) In addition, he told the individuals that he was going to pat

---

[3] In addition, the incident report indicates that Elmore stated that his date of birth was "10-15-22" and provided an eight-digit social security number. Though the parties did not address this information at the evidentiary hearing, the Court notes that this date of birth and social security number would appear obviously incorrect upon hearing them, as the social security number was missing a digit and Elmore would have been 88 years old at the time of the encounter if he had been born in 1922 (he is in fact in his late forties).

[4] On cross examination, Deputy Garner clarified that he did not know exactly what Elmore might have been hiding at this point. When asked by defense counsel if he had a "generalized suspicion" that Elmore was lying about his name to conceal some wrongdoing, Deputy Garner stated that he did. (FTR 2:22:45 - 23:01.) Of course, as explained in more detail in the analysis below, it is apparent from the totality of Deputy Garner's testimony that his suspicion was "generalized" in the sense that he was initially unable to pinpoint the specific legal wrongdoing that Elmore may have been trying to conceal. Moreover, the Court will not penalize the government for Deputy Garner's efforts to testify honestly in response to questions containing legal terminology, the significance of which would not be readily apparent to a person unfamiliar with the governing legal standards.

them down to make sure that everyone was safe. (Id.) Deputy Garner started to place his hand on Elmore's front left pocket, to which Elmore responded by stepping backward and attempting to run. (FTR 2:12:11 - 12:18; doc. no. 22, Ex. A, p. 2.) Deputy Garner grabbed the collar of Elmore's shirt to stop him from fleeing, and a brief struggle ensued, during which time Deputy Banks noticed something fall from Elmore's person onto the ground. (FTR 2:12:19 - 12:47.) After several seconds, Elmore told Deputy Garner that he had a gun. (Id.) Deputy Garner alerted Deputy Banks that Elmore had a gun, and Deputy Banks drew his firearm and ordered Elmore to stop what he was doing. (FTR 2:12:48- 12:53; doc. no. 22, Ex. A, p. 2.) Elmore complied with Deputy Banks's order to stop, at which point Deputy Garner swept his legs out from underneath him, took him to the ground, and placed him in handcuffs. (FTR 2:12:56 - 13:06; doc. no. 22, Ex. A, p. 2.)

After placing Elmore in handcuffs, Deputy Garner began to search his clothing while Deputy Banks attended to the other individuals. (FTR 2:13:05 - 13:11.) Deputy Garner's search revealed that Elmore was carrying a .22 caliber pistol, as well as a small glass jar containing 2.5 grams of marijuana and a small plastic bag containing 6.4 grams of cocaine. (FTR 2:13:12 - 13:55.) Deputy Banks then began to escort Elmore to one of the patrol cars, at which time he found a nine millimeter Smith and Wesson handgun on the ground where he and Elmore had been struggling when Elmore tried to flee. (FTR 2:14:10 - 14:31.)

Deputy Banks eventually searched one of the other individuals and found a firearm. (FTR 2:18:20 - 18:27.) Elmore and his companion carrying a firearm were arrested, while the third individual was not taken into custody. (FTR 2:18:30 - 18:41.) Elmore's true identity was confirmed when another officer – Investigator Newsome – arrived at the scene and

recognized Elmore by sight. (FTR 2:23:37 - 23:46.) Deputy Garner conducted a records check, which revealed that Elmore had been convicted of felonies in the past and was wanted on two outstanding warrants – one for theft and one for aggravated assault. (Doc. no. 22, Ex. A, p. 2.)

## II. DISCUSSION

Elmore asserts that the October 28, 2010 encounter was an impermissible investigatory seizure under the Fourth Amendment because it was not supported by reasonable suspicion; he argues that all the physical evidence seized and statements made as a result of the encounter should therefore be suppressed. (See generally doc. no. 22.) The government agrees that Elmore was eventually seized during the October 28th encounter, but it argues that Deputies Garner and Banks had reasonable suspicion to believe Elmore had engaged in criminal wrongdoing by the time Elmore was seized, such that the seizure did not violate Elmore's Fourth Amendment rights. (See generally doc. no. 25.) The only evidence produced by the parties consists of Deputy Garner's incident report of the October 28th encounter and his testimony from the evidentiary hearing, which provided additional details regarding the encounter but was consistent with the incident report in all material respects. As a result, there is no dispute as to the facts underlying the instant motion. The dispositive issue is whether, under the undisputed facts, Elmore was seized in violation of the Fourth Amendment.

Where a party moves for the suppression of evidence, the movant bears the initial burden of showing that he was subjected to an unlawful search or seizure and that the evidence in question should be suppressed; in the context of a warrantless search or seizure,

the burden then shifts to the government to show that the encounter was consensual or that the search or seizure was justified. See United States v. De la Fuente, 548 F.2d 528, 533 (5th Cir. 1977)[5]; United States v. Beckham, 505 F.2d 1316, 1318 (5th Cir. 1975). As correctly noted by both parties in their respective briefs, police-citizen encounters generally fall within one of three categories: (1) exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; or (3) full-scale arrests. United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006).

> Regarding the first category, it is well-established that:
>
> Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage - provided they do not induce cooperation by cooercive means.

Id. at 777-78 (citing United States v. Drayton, 536 U.S. 194, 200-01 (2002)); see also Florida v. Bostick, 501 U.S. 429, 434 (1991) ("[M]ere police questioning does not constitute a seizure."). For the purposes of Fourth Amendment analysis, a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). A person is not "seized" if "a reasonable person would feel free to terminate the encounter" with the police. Miller v. Harget, 458 F.3d 1251, 1257 (11th Cir. 2006). Factors identified as relevant to this "free to leave" inquiry include, *inter alia*, whether a citizen's path is blocked or impeded, the display

---

[5]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

6

of weapons, and any physical touching of the suspect. Id. However, absent physical force, a seizure does not occur if the subject does not yield to a show of authority. California v. Hodari D, 499 U.S. 621, 625-26 (1991).

Once the interaction rises to the level of a brief seizure or investigatory detention, then the officer must have reasonable, articulable suspicion that the individual has engaged in or is about to engage in criminal activity. Terry, 392 U.S. at 24; United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990) ("[E]ven in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity.") Reasonable suspicion is determined from the totality of the circumstances, United States v. Sokolow, 490 U.S. 1, 8 (1989), and requires that the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop. Terry, 392 U.S. at 21; see also United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007); see also United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004).

Here, contrary to Elmore's argument, the initial portion of the October 28, 2010 encounter was the type of consensual, non-coercive encounter that requires no justification under the Fourth Amendment. During that initial portion of the encounter, Deputies Garner and Banks merely approached Elmore and his companions, asked them routine questions about their presence in the neighborhood, and requested that they produce identification.

7

(FTR 2:09:50 - 11:12.) As noted above, this course of conduct has been explicitly identified as insufficient to establish a Fourth Amendment seizure. See Perez, 443 F.3d at 777 ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street . . . and putting questions to them . . . . Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions [and] ask for identification . . . .").

Following the initial questioning, during which Elmore provided two different names and began pacing back in forth in a nervous manner, Deputy Garner told Elmore and his companions that he was going to pat them down and began to place his hand on Elmore's pocket. (FTR 2:12:11 - 12:18, 2:29:47 - 29:54.) This was the earliest point at which Elmore was seized for Fourth Amendment purposes.[6] See Hodari D, 499 U.S. at 625-26; Acevedo v. Canterbury, 457 F.3d 721, 725 (7th Cir. 2006) (noting that physical touching combined with concomitant show of authority may constitute a Fourth Amendment seizure). Accordingly, everything the deputies had observed prior to that point may provide a basis for

---

[6]Notably, while Deputy Garner intended to conduct a pat-down search of Elmore at this point, he did not do so. Rather, he "barely touched" part of his clothing and did not have a chance to conduct a pat-down search because Elmore immediately stepped back and attempted to run. (FTR 2:12:11 - 12:18, 2:29:47 - 29:54.) Thus, while this slight touch, combined with Deputy Garner's declared intent to conduct a pat-down search, may have caused Elmore to be seized, the search of Elmore's clothing did not occur until later in the encounter. At any rate, Elmore's motion to suppress does not raise the issue of whether the slight touch of Elmore's pocket amounted to the initiation of a pat-down search; rather, he argues that the entire encounter was an illegal seizure and that the search was invalid because it resulted from that seizure. (See doc. no. 22, p. 7.) Moreover, even if this slight touch did amount to the commencement of a pat-down search, such search would not have been unlawful because, for the same reasons set forth in the Court's reasonable suspicion analysis below, Deputy Garner reasonably suspected that Elmore might pose a threat to his and Deputy Banks's safety. See United States v. Hunter, 291 F.3d 1302, 1306 (11th Cir. 2002).

reasonable suspicion. See United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) ("Officers can consider everything that happened up to [the point of seizure] to establish reasonable suspicion."). Here, Deputy Garner observed Elmore's nervous pacing, his unsolicited attempts to corroborate his story, and his presence in a neighborhood where there had been numerous recent burglaries. (FTR 2:11:13 - 11:26; see also United States v. Gordon, 231 F.3d 750, 756 (11th Cir. 2000) (noting that suspect's presence in an area of expected criminal activity is relevant to reasonable suspicion inquiry).) In addition, when Deputy Garner asked Elmore his name, Elmore provided one name and then, without explanation, changed his answer by providing another name. (FTR 2:11:27 - 15:50.)

Under these circumstances, the deputies had reasonable suspicion at the time of Elmore's seizure. First, Elmore's response in which he gave two different names gave rise to a reasonable suspicion that he had supplied a false name to a law enforcement officer, which is a misdemeanor under Georgia law. O.C.G.A. § 16-10-25; see also Stanley v. State, 443 S.E.2d 633, 634 (Ga. Ct. App. 1994) (court found probable cause to arrest suspect for giving false name to police officer because he "provided the police officers with two different names in response to their request that he identify himself"). Through his cross examination of Deputy Garner, Elmore made the point that Deputy Garner was not initially aware of Elmore's true identity and therefore was not absolutely certain that either of the names provided were false until he later confirmed Elmore's real name. However, reasonable suspicion does not require such absolute certainty. Indeed, the threshold for suspicion to be reasonable for Fourth Amendment purposes is "considerably less than proof of wrongdoing by a preponderance of the evidence, or even the implicit requirement of probable cause that

a fair probability that evidence of a crime will be found." Pruitt, 174 F.3d at 1219 (quoting Tapia, 912 F.2d at 1370) (citation omitted); Hunter, 291 F.3d at 1306 ("[R]easonable suspicion may exist even if each fact alone is susceptible to an innocent explanation."). Here, Elmore provided two different names when asked for identification, and he gave no indication that he changed his answer to correct an initial false answer. This was sufficient to give rise to a reasonable suspicion that Elmore had engaged in criminal activity by providing a false name to Deputy Garner, which is all that is required to justify Elmore's initial seizure.

Furthermore, the combination of circumstances was sufficient for Deputy Garner to reasonably suspect Elmore's involvement in criminal activity apart from giving a false name to a law enforcement officer. Deputy Garner testified that he suspected Elmore was involved in criminal activity based on Elmore's presence in an area with recent burglaries, his giving of two different names when asked for identification, his nervous pacing, and his unsolicited attempts to corroborate his story. (FTR 2:11:13 - 15:50.) The fact that Deputy Garner's suspicion was "generalized" in the sense that he did not yet know the precise nature of the criminal activity does not mean that his suspicion was unreasonable. For example, when a suspect flees upon seeing a police officer, the officer may reasonably suspect criminal activity even though he does not yet know what crime the suspect may have committed that motivated his flight. See, e.g., Gordon, 231 F.3d at 756 (suspect's unprovoked flight coupled with presence in high-crime area provided adequate grounds for investigatory seizure, though officers did not know specific nature of criminal wrongdoing when suspect fled). Here, in light of the circumstances above, the Court finds that Deputy Garner's suspicion of Elmore's involvement in criminal activity was reasonable and supported the particularized facts

articulated by Deputy Garner in his testimony. Accordingly, Elmore's seizure did not run afoul of his Fourth Amendment rights.

Notably, following Elmore's initial seizure, he attempted to flee, and, after a momentary struggle with Deputy Garner, revealed that he was carrying a gun. At this point, his attempted flight certainly gave rise to reasonable suspicion of criminal activity. See id. (flight may give rise to reasonable suspicion of criminal activity).

In sum, the Court finds that the initial portion of the October 28, 2010 was a non-coercive police-citizen encounter that did not require justification under the Fourth Amendment. The Court further finds that at the time Elmore was seized, the seizure was supported by reasonable suspicion such that it did not violate his Fourth Amendment rights. Accordingly, Elmore's motion to suppress should be denied.

### III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Elmore's motion to suppress be **DENIED**. (Doc. nos. 14, 22.)

SO REPORTED and RECOMMENDED on this 18th day of March, 2011, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE